UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
_____
                           )
BARBARA J. MURCHISON,      )
        Plaintiff,         )
                           )
        vs.                )   Civil No. JFM-08-2665
                           )
MICHAEL J. ASTRUE,         )
        Defendant.         )   July 29, 2009
                           )
_____)
```

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S SECOND

MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

**CORRECTED, August 20, 2009**

This is an action to enforce an order favorable to Ms. Murchison issued by the EEOC as remedy for discrimination against her in 2000 and 2001, and for trial *de novo* of the EEOC's findings that she was not discriminated against in two selections in those years.

FACTS

A certain amount of background is needed to understand this extraordinary case.

1.   Original discrimination, as admitted by the
agency.

Ms. Murchison has worked for the Social Security
Administration since October 1969.  Exh. 2 ¶ 2.  In 1998,
she successfully competed for the position of GS 13 team
leader of the Community Affairs unit, ORCICA, OEA, OCOMM.[1]
Pl. Exh. 1 at 6-7, ¶¶ 20, 21, 25.

The agency admits that in 2000 and 2001 its deputy
associate director for the Office of Communications, Phil
Gambino, and several of his subordinate managers,[2]
systematically mistreated Ms. Murchison out of a
combination of racism and reprisal motivation.  Their
actions included:

(a)  Harassment related to setting up a breakfast
event in January 2000.  Pl. Exh. 1 at 13-4, 54-5.

(b)  Refusing to allow Ms. Murchison to attend a
conference in Orlando in early 2000.  Pl. Exh. 1 at
15-6;  54-5;  Pl.Exh. 2 ¶ 4.

---

[1]  An issue in dispute at the administrative hearing was whether the
position Ms. Murchison was promoted into was, indeed, a team leader
position.  Administrative Judge Shreffler held that it was Pl. Exh. 1
at 7, ¶ 25.

[2]  These include Michelle Brand, Gene Harting, Annie White, and Nancy
Lloyd.  Pl. Exh. 12 shows the location of each of these within the
chain of command in March 2001, when the case arose.

(c)   Harassment related to an awards program around June, 2000.  Pl.Exh. 1 at 16, 54-5;  Pl.Exh. 2 ¶ 5.

(d)   Wrongfully isolating Ms. Murchison from her team by relocating her to a different building from April 2000 through October 2000.  Pl.Exh. 1 at 9, 54-5.

(e)   Wrongful denial of the opportunity to earn religious compensatory time in March 2001.  Pl.Exh. 1 at 45.

(f)   Failure to engage in an interactive process when, as a disabled employee, Ms. Murchison requested an accommodation in March 2001.  Pl.Exh. 1 at 49.

(g)   Reassigning Ms. Murchison from the position of GS 13 team leader of the community affairs team in ORCICA to the position of team leader in the mail room within OPI, effective March 19, 2001.  Pl.Exh. 1 at 23, ¶ 75 .  Management's action violated the Rehabilitation Act because, among other things, the agency knew that Ms. Murchison had a physical disability which precluded safe performance of the mailroom duties.  Pl.Exh. 1 at 49-50.  The action violated Title VII because it was an act of retaliation for Ms. Murchison's earlier complaints of

discrimination.  Pl.Exh. 1 at 51-2, 60.  (In its
pending motion, the agency relies on this action as
justifying not considering or selecting Ms. Murchison
for subsequent promotions.)

(h)  Refusal, in March 2001, to fill out the
paperwork necessary for applying for the advanced
leadership program.  Pl.Exh. 1 at 28-9, 54-5.

(i)  Refusal to allow Ms. Murchison to attend
senior staff meetings while serving as the mail room
team leader from March through August, 2001.  Pl.Exh.
1 at 57.

(j)  Reassigning Ms. Murchison to a non-
supervisory position in August 2001.  Pl.Exh. 1 at 52-
4.

(k)  Refusing to allow Ms. Murchison to attend a
national public affairs conference in August 2001.
Pl.Exh. 1 at 57.


These are not charges by Ms. Murchison.  These are the
agency own findings of fact and conclusions of law.[3]

---

[3]  The way the federal sector EEO complaint process works, although
there is a decision by an EEOC administrative judge, that decision is
not binding on the agency until and unless the agency adopts it as its
own.  29 C.F.R. § 1614.110(a).  In this case, EEOC administrative judge
Marlin Shreffler issued his decision on September 21, 2005 (Pl.Exh. 1),
and issued an order entering judgment on May 31, 2006 (Pl.Exh. 4).  The
agency adopted his decision on July 14, 2006 (Pl.Exh. 11).

2.  Mr. Gambino's role.

Actions (a) through (f) were taken while Ms. Murchison was the GS 13 team leader of the community affairs unit, reporting to Michelle Brand, the director of ORCICA.  As a direct result of Ms. Murchison's complaining of her treatment at Ms. Brand's hands, Phil Gambino ordered Ms. Murchison transferred to the position of GS 12 team leader in the mail room (although generously allowing her to keep her grade).  He then immediately effected Ms. Brand's reassignment to his personal staff.  Pl. Exh. 2, ¶¶ 10, 11.

A couple of months later, with or without the participation of his senior adviser, Mr. Gambino reassigned Ms. Murchison from the mail room team leader position to a non-supervisory GS 13 position in a related office, effective August 2001, rather than returning her to her community affairs team leader position.  Action (j).

In the meantime, other managers under Mr. Gambino's supervision took several additional discriminatory and retaliatory acts against Ms. Murchison between March and August 2001.  Actions (h)-(k).  This continuation of the mistreatment of Ms. Murchison that had begun in January

2000 is inexplicable unless the chain of command between the mailroom and Mr. Gambino were acting at his direction.

### 3. Mr. Gambino selects a white woman for a temporary promotion in preference to Ms. Murchison, because he had illegally transferred Ms. Murchison to the mailroom.

Immediately after illegally reassigning Ms. Murchison to the mailroom, Mr. Gambino promoted Ms. Brand from ORCICA to his personal staff. Def. Exh. 9; Pl.Exh. 2 ¶ 10. That left vacant the GS 14 position of ORCICA director. Within weeks, Mr. Gambino decided to fill the vacancy through a 120 day temporary promotion. He selected a white woman, Robin Neal, for the promotion.[5]

The sole reason relied on by the agency for not having selected Ms. Murchison for the vacancy was that by illegally reassigning her to the mailroom Mr. Gambino had effectively rendered her ineligible for promotion to vacancies, even temporary vacancies, in ORCICA:

> 9. I did not consider any employees outside ORCICA to fill the vacant position.

Def. Exh. 9 at 2.

---

[5] Ms. Neal had been assigned to Ms. Murchison community affairs team leader position as soon as the latter was illegally removed from it. Pl.Exh. 13 at 1.

He justifies relying on her being outside ORCICA as a disqualifying factor on the ground that selecting from within facilitated a smooth and effective transition:

> 5.   To effect this priority, under such circumstances, the standard practice of the agency was (and is) to select an employee from the group where the vacancy exists to fill the vacancy.   The agency believes that this practice facilitates the most effective transition because the selected employee from the group is most familiar with the current issues and the workload of the group and can step right into the vacancy.

Def. Exh. 9 at 1.

Finally, Mr. Gambino explained that Ms. Neal's being in ORCICA contrasted with Ms. Murchison's having been removed from that office:

> 8.   At the time this vacancy arose, Robin Neal was working in ORCICA and was qualified for the noncompetitive temporary promotion.   Ms. Murchison was not working in ORCICA at this time, but rather was working in OPI, which is an entirely separate office.   Ms. Neal was able to step right into the vacancy and effectuate a smooth transition as acting director of ORCICA.

Def. Exh. 9 at 2.

The agency does not deny that but for Mr. Gambino's illegal reassignment of Ms. Murchison to the mail room she would have been "working in ORCICA and . . . qualified for the noncompetitive temporary promotion . . . [and] able to step right into the vacancy and effectuate a smooth transition as acting director of ORCICA."   Mr. Gambino's

- 7 -

sole articulated non-discriminatory reason for not

selecting Ms. Murchison for the temporary promotion was

that several weeks earlier he had illegally transferred her

to the mailroom.[6]

There is, moreover, no dispute that Ms. Murchison was

highly qualified for the temporary promotion:

> I was fully qualified to serve as ORCICA director
> on a temporary basis. As the Team Leader of the
> Community Affairs Staff for over 2 years, I have
> a working knowledge, skills, and ability to
> assign, implement, review, plan, coordinate
> events and special projects with my staff.  In
> addition, I scheduled regular staff meetings to
> assure that these assignments were "on track" and
> to make suggestions and changes when needed.
>
> Every week, the team leaders in OEA would meet
> with our Associate Commissioner to provide an
> update on our programs, projects, and assignment.
> In doing so, the team leaders had an opportunity
> to discuss with each other the different types of
> work products assigned to their responsible area,
> i.e. Focus Groups.  After meeting with the
> Associate Director, I was responsible for
> preparing meeting notes for my office director,
> Michele Brand.  I was also responsible for
> alerting my office director regarding training
> needs and the status of employee's ability to
> manage their work loads.

Pl.Exh. 2, ¶ 12.

---

[6]  Stated otherwise, Ms. Murchison's qualifications were so superior to
those of Ms. Neal that the only way Mr. Gambino could justify selecting
the latter rather than the former was to illegally transfer the former
out of the office.

That, no doubt, is why Mr. Gambino did not claim he selected Ms. Neal because she was better qualified than Ms. Murchison.

> 4.   One of Mr. Gambino's subordinate managers, in consultation with Mr. Gambino, selects a white woman in preference to Ms. Murchison for a permanent promotion, because Ms. Murchison's illegal transfer to the mailroom meant the manager did not know her as well as he knew the white woman.

In 2002 the agency again had to choose between Ms. Neal and Ms. Murchison for promotion, and again chose the white woman who had not challenged discrimination.  The putative selecting official, Mr. Byrd, admittedly consulted with his chain of command, i.e., Mr. Gambino:

> Q:   Was it your understanding that you were selecting Ms. Neill for a permanent position?
>
> B:   Originally the position was temporary and then, yes, it became permanent.
>
> Q:   Who made that decision?
>
> B:   I made that decision.  I made the decision for both but I consulted my chain of command every step of the way.

Pl.Exh. 10 at 598.

Mr. Gambino confirmed that Mr. Byrd discussed the selection with the front office, i.e., himself:

- 9 -

> Q:   Do you have any knowledge of Robin Neal
> being promoted to a GS-14 position in October
> 2001?
>
> G:   I did become aware of that, yes.
>
> Q:   Did you have any input with regard to her
> promotion?
>
> G:   That promotion package, you know, would
> have, you know, been discussed with the front
> office, went over by David Byrd and David Byrd
> was the selecting official, but I was very
> positive that Robin Neill is a extremely,
> extremely good supervisor, great skills, mature.
> I had opportunities to work with her on several
> things.  I thought it was a good decision.

Pl.Exh. 10 at 454-5.

This is consistent with the fact that Mr. Gambino was consulted on the 1998 selection of Ms. Murchison to be a GS 13 team leader, Pl.Exh. 10 at 452.  It is also consistent with the agency's claim that Mr. Gambino personally made the selection for a temporary promotion to GS 14.  Def. Exh. 9.  Finally, it is consistent with the fact that Mr. Byrd was new to the agency, and would have no basis for knowing the strengths and weaknesses of many of the candidates other than through reliance on management colleagues like Mr. Gambino.

- 10 -

5. Remedy ordered by judge Shreffler and agreed to by agency.

As remedy for illegally moving Ms. Murchison out of her community affairs team leader position and ultimately into a non-supervisory position, judge Shreffler decided that "The Agency shall return Complainant to the position of Social Insurance Specialist (Team Leader), Community Affairs Section, ORCICA, OEA, OCOMM, GS-13 (or its equivalent)." Pl. Exh. 1 at 60.

The agency, in its own final decision, agreed to do so. Pl. Exh. 11.

6. Ms. Murchison's successful petition for enforcement of decision to restore her to her team leader position.

After judge Schreffler issued his decision, the agency had the option of adopting it as its own, 29 C.F.R. § 1614.110, or seeking review of it by the EEOC. 29 C.F.R. § 1614.403. It took the first course.

On the other hand, Ms. Murchison did file a timely appeal of the decision's holding that there had been no discrimination in making certain selections for promotions.

While her appeal was pending, Ms. Murchison also filed a petition for enforcement with the EEOC under 29 C.F.R. §

- 11 -

1614.504, seeking compliance with the decision that she be returned to her community affairs team leader position.

In his decision granting Ms. Murchison's petition for enforcement (which was issued together with his decision on her appeal on the promotion issues), the OFO director found, as a fact, that the agency had not attempted to restore Ms. Murchison to the team leader position.[7]  He found that delay to this point was not improper, as it was based on confusion caused by the pendency of a related class-action:

> In its final order, the agency agreed to implement the decision of the EEOC Administrative Judge (AJ), dated May 31, 2006, making final his interim decision issued on September 21, 2005, in favor of complainant.  However, some of the corrective action ordered by the agency, including complainant's return to her former position, did not take place, because her complaint was subsumed in a class complaint certified by the Commission.

Exh. 3 at 1.

The OFO director found the class action complaint provided no impediment to restoring Ms. Murchison to her team leader position, Pl.Exh. 3 at 2-3.  He then ordered, in no uncertain terms, that Ms. Murchison be returned to her team leader position:

For the reasons that follow, the Commission

---

[7]  Thus, it is undisputed that as of July 25, 2008, the agency had not restored Ms. Murchison to her team leader position (or equivalent).

- 12 -

affirms the decision of the AJ and the agency and
orders implementation, including complainant's
return to her former position.

Pl.Exh. 3 at 2.

Lest there be any mistake, in the order section of its
decision, the OFO identified the specific position to which
Ms. Murchison was to be returned:

A.   The Agency shall return complainant to the
position of Social Insurance Specialist (Team
Leader), Community Affairs Section, ORCICA, OEA,
OCOMM, GS-13 (or its equivalent acceptable to
her).

Pl.Exh. 3 at 6.

In a footnote, the decision says, "If the agency has
taken the action ordered, it need only report that to the
Compliance Officer with documentation showing what action
was taken." Pl.Exh. 3 at 6 n. 7. As mentioned above,
however, the decision itself had found that the Ms.
Murchison had not yet been returned to her team leader
position. Pl.Exh. 3 at 1.

7.   <u>Deadlines for complying and for reporting on</u>
<u>compliance.</u>

The EEOC's decision told the agency that it had to
comply with its terms within 30 days, that it had to submit
a report of compliance within 30 days after that, and that
it had to serve Ms. Murchison with a copy of that report:

- 13 -

> The agency is further directed to submit a report
> of compliance to the Commission's Compliance
> Officer . . . . The report shall include
> documentation of the agency's action as evidence
> that the corrective action has been taken and
> implemented.
>
>             *                *               *
>
> The agency shall submit its compliance report
> **within thirty (30) calendar days** of the
> completion of all ordered corrective action.  . .
> .  The agency's report must contain supporting
> documentation, and the <u>agency must send a copy of
> all submissions to the complainant</u>.

Pl.Exh. 3 at 7 (bold type in original;  underlining

supplied).

On August 5, 2008, the EEOC sent the agency a letter,

reiterating its obligation to submit a written report of

compliance and to serve the report on Ms. Murchison:

> Your report must be writing.  It should enumerate
> each of the actions taken as ordered and include
> appropriate written documentation, e.g., copies
> of personnel action forms . . . .  <u>A copy of your
> report must be sent to the complainant</u>.

Pl.Exh. 14 (underlining supplied).

It is undisputed that the agency never served Ms.

Murchison with a copy of any compliance report.  Pl.Exh. 2,

¶¶ 13, 20, 21.

8. <u>The EEOC interpretation of time limits for Ms.</u>
   <u>Murchison to file a civil action, and of the</u>
   <u>relationship between a civil action and a</u>
   <u>petition for administrative enforcement.</u>

The EEOC's decision explicitly told Ms. Murchison that she had two options to seek enforcement of the decision's orders. First, she could invoke the EEOC's own enforcement process:[8]

> If the agency does not comply with the
> Commission's order, the complainant may petition
> the Commission for enforcement of the order. 29
> C.F.R. § 1614.503(a).

Pl.Exh. 3 at 7.

Second, the EEOC reminded Ms. Murchison that she "also" had the right to go directly to court to seek enforcement, and noted the deadline for doing so:

> The complainant also has the right to file a
> civil action to enforce compliance with the
> Commission's order prior to or following an
> administrative petition for enforcement. *See* 29
> C.F.R. ¶¶ 1614.407, 1614.408, and 29 C.F.R. ¶
> 1614.503(g). A civil action for enforcement or a
> civil action on the underlying complaint is
> subject to the deadline stated in 42 U.S.C.
> 2000e-16(c).

---

[8] The EEOC actually has two enforcement processes. The first, which Ms. Murchison had already used, is for enforcement of agency decisions like that issued by SSA in this case on July 14, 2006, Pl.Exh. 11. 29 C.F.R. § 1614.504. The second is for enforcement of final EEOC decisions, like that issued on July 25, 2008. 29 C.F.R. § 1614.503.

The latter process consists of asking the agency why it has not complied, and then strongly urging compliance.

Pl.Exh. 3 at 7.

The decision put into bold letters the fact that if she did file a civil action, any administrative enforcement action would terminate:

> **If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated.** *See* 29 C.F.R. ¶ 1614.409.

Pl.Exh. 3 at 7 (bold in original).

### 9. Filing of civil action

According to the EEOC's decision, Ms. Murchison had to file her civil action for enforcement within the 42 U.S.C. 2000e-16(c) deadline, which is 90 days from the date of the final decision. On the other hand, Ms. Murchison had no reason to seek enforcement until expiration of the agency's deadlines to comply and report compliance. She therefore filed this action during the period between 60 and 90 days from the date of the EEOC decision.

### 10. Subsequently revealed information

Defendant's Exhibit 4 to the pending summary judgment motion is a document which apparently was not available to defendant when he filed his first summary judgment motion. It appears to be a September 30, 2008, email from someone

in SSA to Cecily Stark at the EEOC, transmitting "proof all corrective items were completed in the case of Barbara Murchison . . ." Def. Exh. 4. It includes the following passage:

> SF-50 to show Ms. Murchison was promoted and is currently in a GS-13 Social Insurance Specialist position.
>
> <<Barbara Murchison [SF-50 for the GS-13 position].pdf>>

Def.Exh. 4.

Although the agency supplied the court with the alleged September 30 email, it did not supply the indicated attachment.

Ms. Murchison not only knows that she has not been restored to her former position, but she knows that her official personnel folder contains no SF 50 showing such a restoration. Pl.Exh. 2, ¶ 24.

In February 2009, four months after Ms. Murchison filed her civil action, her attorney received an odd letter from "John Flanigan, Compliance Officer, Compliance and Control Division," of the Office of Federal Operations at the EEOC. It reads in its entirety:

> This is to notify you that compliance monitoring activity has ceased on the above-referenced Compliance Tracking number for the reason(s) cited below:
>
> *    The agency has provided us documentation

> sufficient to demonstrate that it has taken
> the corrective action(s) ordered in the
> Commission's decision. **This action will not
> be construed as an adjudication of the
> merits of any claim(s) arising out of the
> corrective action.**

If you have any questions, please contact me . ..

Pl.Exh. 8 (emphasis in original).

Ms. Murchison did contact Mr. Flanigan and asked for
copies of the documentation. He did not provide it.

Pl.Exh. 2, ¶¶ 17-19.

Although Mr. Flanigan ignored Ms. Murchison's request
for the documentation, on May 22, 2009, he responded to a
similar request by counsel for defendant (who immediately
shared the response with Ms. Murchison's counsel).
Significantly, Mr. Flanigan specifically denied that the
agency had submitted a report of compliance:

> As will be noted, SSA did not provide a final
> document titled, Report of Compliance, but did
> provide copies of documents demonstrating
> compliance.

Def. Exh. 3.

Mr. Flanigan gave counsel not the single SF 50 alluded
to in the agency's September 2008 email, but two SF 50s,
both taken from the original administrative record in the
case. The agency did not submit these documents in support
of its motion, because they obviously could not have been
submitted to the EEOC as evidence of compliance with the

- 18 -

order to restore Ms. Murchison to the team leader position. One is the October 1998 SF 50 recording Ms. Murchison's original promotion to the community affairs team leader position, Pl.Exh. 15;  the second is a December 30, 1999, notification that she was to receive the January 2000 across-the-board pay increase.  Pl. Exh. 15.  Unless the agency engaged in brutally cynical dishonesty, it could not have submitted these documents to Mr. Flanigan as evidence that it had complied with the July 2008 restoration order; how in fact he got them is not clear from the existing record.

I    MS. MURCHISON IS ENTITLED TO COMPLIANCE WITH THE
     DECISION TO REASSIGN HER TO HER TEAM LEADER POSITION.

This is an action asking the court to "compel agency action unlawfully withheld," 5 U.S.C. § 706, to "compel an officer or employee of the United States . . . to perform a duty owed to the plaintiff," 28 U.S.C. § 1361, and to comply with its responsibilities under Title VII, 42 U.S.C. 2000e-16(c).

The agency does not deny that it was and is subject to a July 25, 2008, order by the EEOC requiring it to restore Ms. Murchison to her team leader position.  The agency does

not claim that it has complied with the order.  What the agency first argues is that orders such as that of July 2008 cannot be judicially enforced unless the agency fails to timely submit a report of compliance, including the SF 50s demonstrating compliance, and that in this case the agency did timely submit such a report.

The agency's second argument is that even if this court had jurisdiction to judicially enforce the July 2008 order at the time Ms. Murchison filed her civil action, the court was ousted from that jurisdiction four months later by a letter from an EEOC operative, not issued "for the commission," which does not purport to be an adjudication, and which was secured by the agency through illegal ex parte communication of patently false information.

The agency's third argument, which should not have to be reached in light of the above, is that if a timely report of compliance is submitted, then the nominally final EEOC decision is no longer judicially enforceable and does not become so unless the employee obtains a further determination by the EEOC that its decision has not been complied with.

A.   DEFENDANT CORRECTLY CONCEDES THAT THERE IS DISTRICT

COURT JURISDICTION TO ENFORCE FINAL EEOC DECISIONS.

The agency concedes that 5 U.S.C. § 706, 28 U.S.C. §

1361, and 42 U.S.C. § 2000e-16(c) would give this court

jurisdiction to enforce the July 2008 decision if the

agency failed to file the compliance report required by the

EEOC regulations and the July 2008 decision itself.  The

agency also concedes that the cited provisions would give

this court jurisdiction if Ms. Murchison had filed a

petition for administrative enforcement under 29 C.F.R. §

1614.503 and the EEOC had investigated and found that the

agency had not restored her to the team leader position:

> Plaintiff may bring an enforcement claim in this
> court . . . "if the EEOC has made a prior
> determination that the agency is not in
> compliance with the EEOC's earlier Order or if
> the agency has failed to file a required
> compliance report."

Def. Motion at 7.

Thus, the issue between the parties is not whether the

district courts have jurisdiction to enforce the final

decision of the EEOC, but what preconditions, if any, have

to occur before the court has jurisdiction (and what

conditions might oust the court's jurisdiction once it has

been obtained).

- 21 -

1. <u>Since the agency did not submit the compliance</u>
<u>report required by the EEOC, even on the agency's</u>
<u>reading of the law this court should enforce the</u>
<u>EEOC's decision.</u>

As noted above, the agency concedes at least that the
July 2008 decision would be a judicially enforceable final
decision if the agency failed to comply with the EEOC's
instruction on filing a timely compliance report.

The agency relies on Def. Exh. 4 as proof that it
filed a timely compliance report as required by the EEOC
regulations and the final decision in this case.

On its face, the exhibit cannot be relied on in
support of the agency's motion. To begin with, there is no
evidence of its authenticity, and there are several
indicators to the contrary. These include the facts that
the exhibit apparently was unknown to defendant when he
filed his first motion to dismiss, and the fact that the
exhibit was apparently unknown to the EEOC's Mr. Flanigan
when, in May 2009, (a) he told agency counsel that he had
never received a report of compliance as such and (b) he
told agency counsel that he had received two SF 50s rather
than the one referenced in Def.Exh. 4.

Perhaps more importantly, Def.Exh. 4, if authentic,
was submitted *ex parte*, in direct violation, not only of

- 22 -

the EEOC's specific directives to the agency in this
particular case, Pl.Exh. 3 at 7, Pl.Exh. 12, but of general
federal administrative law:

> (1) In any agency proceeding which is subject to
> subsection (a) of this section, except to the
> extent required for the disposition of ex parte
> matter as authorized by law—
>
> > (A) no interested person outside the agency
> > shall make or knowingly cause to be made to
> > any member of the body comprising the agency
> > . . . or other employee who is or may
> > reasonably be expected to be involved in the
> > decisional process of the proceeding, an ex
> > parte communication relevant to the merits
> > of the proceeding.

5 U.S.C. § 557(d).

In addition, a "report of compliance" has two
elements: a cover letter (or email), and the actual
documentation of the compliance (e.g., relevant SF 50s.)
Pl.Exh. 3 at 7; Pl.Exh. 14. The agency cannot reap the
benefit of having filed a timely report of compliance
without submitting the actual documentation of the
compliance.

The agency did not submit the alleged attachments to
Def.Exh. 4 when it submitted the exhibit itself. Keeping
in mind the undisputed fact that the agency had not
restored Ms. Murchison to her team leader position, there
are only a few possibilities. One is that the attachment
simply recorded Ms. Murchison 1998 promotion to the team

leader position; i.e., that on its face it was not
documentation of compliance with the order to restore Ms.
Murchison to her team leader position. Another is that
there was no such attachment. A third is that the document
was a phony SF-50, one falsely showing that Ms. Murchison
had been restored to her team leader position. Whatever
the reason for the agency's failure to provide the document
to the court, it forfeits its demand that this court
dismiss Ms. Murchison's suit because it had submitted the
document to the EEOC as proof of compliance with the July
2008 order.

In short, even were there a rule that Ms. Murchison
could not file an enforcement action if the agency had
first submitted a report of compliance, no such report was
submitted within the meaning of the putative rule.


2.   The Flanigan letter does not deprive this court of
     jurisdiction.

The OFO's July 2008 decision stated in bold letters
that once Ms. Murchison filed this action, administrative
processing of compliance issues would cease:

> **If the complainant files a civil action, the
> administrative processing of the complaint,
> including any petition for enforcement, will be
> terminated.** *See* 29 C.F.R. ¶ 1614.409.

Exh. 3 at 7 (bold in original).

Here, of course, there was no petition for enforcement, as Ms. Murchison relied on the EEOC's advice that she need not file such a petition as a precondition to judicial enforcement.

Although the EEOC regulations provide for certain actions to be taken by the Office of Federal Operations, for the commission, in the event a petition for administrative enforcement is filed, the regulations do not otherwise provide for an administrative determination of compliance *vel non* by the OFO for the commission. In addition, of course, the Flanigan letter does not purport to be "for the commission."

Most importantly, the agency provides no authority for the proposition that an Article III court, once having obtained jurisdiction over a dispute, is ousted from that jurisdiction by the subsequent issuance of a confessedly non-adjudicatory letter issued on his own authority by an inferior employee of the adjudicatory agency.

3. <u>There is no rule that requires a petition for administrative enforcement as a pre-condition for judicial enforcement.</u>

The agency appears to argue that if it had submitted a proper, timely, compliance report, then the July 2008 decision would not have been a judicially enforcement final decision until Ms. Murchison filed a petition for administrative enforcement, the EEOC concluded that the agency not complied with the decision, and the EEOC informed her of her right to obtain judicial enforcement.

The agency's argument is rooted in several court cases interpreting 29 C.F.R. § 1614.503(g). However, the EEOC itself currently interprets its regulations as allowing judicial enforcement of the July 25 decision without first seeking administrative enforcement. Indeed, the EEOC's current interpretation is that if the employee first opts for administrative enforcement, and then files a timely civil action, the administrative case is aborted:

> If the agency does not comply with the
> Commission's order, the complainant may petition
> the Commission for enforcement of the order. 29
> C.F.R. § 1614.503(a). The complainant also has
> the right to file a civil action to enforce
> compliance with the Commission's order prior to
> or following an administrative petition for
> enforcement. *See* 29 C.F.R. ¶¶ 1614.407,
> 1614.408, and 29 C.F.R. ¶ 1614.503(g). A civil
> action for enforcement or a civil action on the
> underlying complaint is subject to the deadline

- 26 -

stated in 42 U.S.C. 2000e-16(c). **If the
complainant files a civil action, the
administrative processing of the complaint,
including any petition for enforcement, will be
terminated.** *See* 29 C.F.R. ¶ 1614.409.

Exh. 3 at 7 (bold in original).

(It should be noted that the employee's deadline for
filing a civil action was 90 days from final EEOC decision.
Thus, if the employee filed a petition for administrative
enforcement, and then filed an untimely civil action, the
administrative case would presumably continue while the
civil action would be dismissed.)

The cases cited by the agency do not invalidate the
EEOC's current interpretation of its own regulation.  In
*Malek v. Leavitt*, 437 F.Supp.2d 517 (D.Md. 2006), the
employee opted to not file a civil action within 90 days of
the final EEOC decision, but to instead file a 29 C.F.R. §
1614.503(g) petition for administrative enforcement.  After
several years, the EEOC found that, in fact, the agency had
complied with the earlier final decision.  The district
court held that the EEOC's failure to find under §
1614.503(g) that the agency was violating the final
decision barred judicial enforcement of the final decision.
The *Malek* court was not presented with the EEOC's current
interpretation of its regulations as allowing judicial
enforcement of its final decisions if that enforcement is

sought within 90 days of the decision, without the filing of a § 1614.503 petition for administrative enforcement. It did not, therefore, invalidate the EEOC's current interpretation.

The issue in *Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006) was whether an employee who prevailed before the EEOC could obtain trial *de novo* of a claim seeking greater remedy than the EEOC awarded, without submitting the merits of the underlying discrimination claim to trial as well. The court noted that the case before it was not an action for enforcement of the EEOC final decision, but a challenge to that decision. 438 F.3d at 417. The court acknowledged that there was such a thing as a suit to enforce a final EEOC decision, but emphasized that "the contours of [such suits] are not relevant here." *Ibid.* Precisely because Mr. Laber was not seeking enforcement of a final decision, the parties had no motive to brief, and the court had no occasion to decide, whether the EEOC is in error when it currently interprets the law and regulations as providing for judicial enforcement of a final decision without a prior § 1614.503 petition for administrative enforcement.

II   THE AGENCY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
     CLAIM THE SELECTION FOR A 120 DAY PROMOTION AS
     DIRECTOR OF ORCICA WAS NOT A CONTINUATION OF
     MANAGEMENT'S DISCRIMINATION AND REPRISAL AGAINST MS.
     MURCHISON.


     In April 2001 the agency gave Robin Neal a 120 day
temporary promotion to GS 14 in preference to Ms.
Murchison.  Ms. Murchison claims this was another in a
series of actions discriminatory on the basis of race and
an act of reprisal for her protected activity.  The agency
has articulated a non-discriminatory reason for the
decision.  As emphasized by the D.C. Circuit, once the
defendant articulates a non-discriminatory reason for his
decision, Supreme Court precedent bars discussion of
whether the plaintiff has made out a prima facie case.
*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494
(D.C. Cir. 2008).

     The agency's articulated reason is that it
legitimately failed to even consider whether Ms. Murchison
would be a better choice for the temporary appointment than
Ms. Neal was.  Mr. Gambino states that Ms. Murchison was
not even considered for the promotion because, at the time

it was made, she had already been illegally transferred out
of ORCICA.

    Based on all this, a reasonable jury could find:

    1.   Ms. Murchison was at least as qualified for the
120 day promotion as Ms. Neal was.

    2.   One of the reasons for illegally reassigning Ms.
Murchison to the mail room job was to create a pretext
for not considering her for the ORCICA temporary
promotion.

    This should be enough to require the denial of the
agency's motion for summary judgment.

III  THE AGENCY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
     CLAIM THE SELECTION FOR A PROMOTION TO EXECUTIVE
     OFFICER WAS NOT A CONTINUATION OF MANAGEMENT'S
     DISCRIMINATION AND REPRISAL AGAINST MS. MURCHISON.

    Based on the evidence set out above, a reasonable jury
could conclude, first, that Mr. Gambino had a substantive
role in deciding whether Ms. Murchison or Ms. Neal would be
selected for the GS 14 executive officer position, and,
second, that Mr. Gambino used his influence to bar Ms.

Murchison's selection, as a continuation of his lengthy
series of illegal actions designed to retaliate against her
for protesting earlier discrimination against her.

Alternatively, a reasonable jury could refuse to
accept a justification for rejecting Ms. Murchison which
stems directly from Mr. Gambino's illegal transfer of her
out of ORCICA.

IV    MS. MURCHISON IS ENTITLED TO DISCOVERY OF RELEVANT
      EVIDENCE UNDER RULE 26 BEFORE HAVING TO RESPOND TO A
      MOTION FOR SUMMARY JUDGMENT.

Although Ms. Murchison believes the evidence discussed
above suffices to allow her to withstand summary judgment,
if the court finds that she in fact has not proven facts
essential to justify her opposition, the court should deny
the summary judgment motion or order a continuance in order
to allow her to take discovery.  Fed.R.Civ.Proc. 56(f).
The accompanying declaration by Ms. Murchison identifies
the types of evidence she needs to obtain through
discovery.  Pl.Exh. 2 ¶¶ 27-32.

The Supreme Court has stated in no uncertain terms
that an employment discrimination plaintiff is entitled to

- 31 -

discovery in order to attempt to find direct evidence of discrimination:

> Under the Second Circuit's heightened pleading standard, a plaintiff without direct evidence of discrimination at the time of his complaint must plead a prima facie case of discrimination, even though discovery might uncover such direct evidence. It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered.

*Swierkiewicz v. Sorema*, 534 U.S. 506, 511-2 (2002).

The rule in this circuit always has been that summary judgment cannot be granted unless the nonmovant has had an opportunity to obtain discovery evidence relevant to the claims and defenses:

> Williams's testimony that she believed her evaluations to be "unfair and untrue and incorrect" is merely a self-serving opinion that cannot, absent objective corroboration, defeat summary judgment. [citations omitted]. Under the district court's order limiting discovery, however, Williams was not permitted to adduce such corroborative evidence (if it indeed exists). Summary judgment was therefore inappropriate, since "the nonmoving party had not had the opportunity to discover information that is essential to [her] opposition."

*Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004).

Consequently, this court had held that a plaintiff has a right to discovery before a Rule 12(b)(6) motion is converted to one for summary judgment:

> Once notified [that a Rule 12(b)(6) motion has been converted to a motion for summary judgment], a party must be afforded a "reasonable opportunity for discovery" before a Rule 12(b)(6) motion may be converted and summary judgment granted. *Johnson [v.Rac Corp.] 491 F.2d at 515.* Such an opportunity was not provided in the case at bar.

*Gay v. Wall*, 761 F.2d 175, 177-8 (4th Cir. 1985).

Generally the district courts in this circuit follow this rule. Thus, they hold that, by definition, where no order allowing discovery has yet been entered, summary judgment cannot be granted. *Walter Kidde Portable Equipment, Inc. v. Universal Security Instruments, Inc.*, 2007 U.S. Dist. LEXIS 25367 *9 (M.D.N.C. 2007). Ruling on a such a premature motion is deferred until the nonmovant has an opportunity to take discovery. *Scott v. WFS Financial, Inc.*, 2007 U.S. Dist. LEXIS 3967 *24-5 (E.D.Va. 2007). Thus, in practice, defendant's failure to get a complaint dismissed results in discovery. *Booth v. Maryland Dept. of Public Safety & Correctional Services*, 2006 U.S.Dist.LEXIS 49313 (D.Md. July 7, 2006).

In the present case, the need for discovery is obvious. For example, Ms. Murchison pointed out in her

opposition to defendant's first summary judgment motion that he had identified no evidence that the reason for rejecting her for the ORCICA temporary promotion was that she was no longer working in ORCICA. Indeed, the administrative record contained no evidence of any reason for that decision.

Therefore, to avoid a successful cross-motion for summary judgment by Ms. Murchison, the agency has now submitted a declaration from Mr. Phil Gambino. Mr. Gambino had, in fact, testified at the administrative hearing. The agency made the tactical decision to not have him testify along the lines of his 2009 declaration, because he would have been subject to cross-examination and to the administrative judge's scrutiny of his demeanor.

Now the agency is asking this court to grant summary judgment based on Mr. Gambino's seven-years-after-the-fact declaration. Leaving aside everything else, it is highly likely that there are contemporaneous records of the decisions to get Ms. Murchison out of ORCICA in time to use that as a pretext for selecting Ms. Neal for the temporary promotion. In any event, Ms. Murchison is also entitled to depose Mr. Gambino before the court relies on his declaration.

In addition, to uncover direct evidence, Ms. Murchison

needs to begin with standard interrogatory no. 1:

> Identify all persons who are likely to have
> personal knowledge of any fact alleged in the
> complaint, and state the subject matter of the
> personal knowledge possessed by each such person.

and standard document request no. 3:

> All documents (including, but not limited to,
> correspondence, notes, memoranda, and journal
> entries) which relate to, describe, summarize, or
> memorialize communications among Mr. Gambino, Ms.
> Brand, and Mr. Byrd regarding the filling of the
> positions which are the subject of count II or
> count III.

Pl.Exh. 2 ¶¶ 27-33.

Those general discovery requests would also likely

lead to evidence relevant to the circumstantial evidence

cases.[9]  So, obviously, would be the depositions of the

people identified in response to standard interrogatory no.

1, including, of course, Mr. Gambino, Ms. Brand, and Mr.

Byrd.

Examples of more specific discovery requests are:

*    Provide a copy of all compliance reports that the

agency submitted to the EEOC.  Pl.Exh. 2 ¶¶ 27-29.

*    Provide copies of the SF 50s and SF 52s used in

filling the positions which are the subject of counts

---

[9]  For example, the agency relies on the hearing testimony of David Byrd
as evidence that he was unaware of Ms. Murchison's race and of her
challenges to discriminatory treatment.  It is highly unlikely that Mr.
Gambino and Ms. Brand would have failed to brief him on the
undesirability of promoting Ms. Murchison.  Evidence of those briefings
would be found in the depositions of Gambino, Brand, and Byrd.

II and III.  Pl.Exh. 2 ¶ 34.

\*    Provide copies of the vacancy announcements that have been used when filling on a permanent basis the position of Director, ORCICA.  Pl.Exh. 2 ¶ 33.

Unless the court denies the motion for summary judgment on other grounds, it should at least defer ruling until Ms. Murchison has had an opportunity to complete normal Rule 26 discovery.

CONCLUSION

The motion for summary judgment should be denied.

Respectfully submitted,

*Phillip R. Kete*

Phillip R. Kete
General Counsel, AFGE Local 1923
OPS 1720
6401 Security Blvd.
Baltimore, MD  21235
Bar No. 05117
(410) 966-6500

July 29, 2009
Corrected August 20, 2009